UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:07 CR 109 JCH |
| ) | DDN |
| TIMOTHY DUANE RANKINS, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the Court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on January 10, 2008. At the conclusion of the hearing counsel requested and the court granted a period of seven days for the filing of a post-hearing memorandum.

**1. Pro se motions**

Defendant Timothy Duane Rankins moved pro se for permission to buy and cook his own food due to certain food allergies (Docs. 13 and 22). From the information placed on the record at the hearing on January 10, 2008, the court finds that the circumstances of defendant Rankins's pretrial incarceration, relating to his asserted food allergies, are being carefully and reasonably attended to by the Marshals Service. These motions will be denied as moot.

**2. Motion to suppress evidence**

Defendant has moved to suppress evidence and statements (Doc. 21). From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. At about 2:00 a.m. on March 9, 2007, Pemiscot County, Missouri, Deputy Sheriff Jesse Cagle was informed by the Missouri State Highway Patrol that it had received a report that a male named Timothy Rankins was holding Mable Ross and her three children at gunpoint in a white Buick Park Avenue

automobile, bearing Missouri license 483-XTB. Ross and her children were reported to be victims of an armed car-jacking in Memphis, Tennessee, forty minutes earlier, and the car was now headed northbound on Interstate 55 towards Chicago, Illinois. The Sheriff's Department ran that license number and found that it was registered to a 1998 white Buick Park Avenue owned by Mable Ross of Sikeston, Missouri. Deputies Cagle and Bryan Burgess, as well as Lieutenant Gary Swan, were dispatched to northbound I-55 to investigate the report and search for the vehicle.[1]

2.     At about 2:50 a.m. on March 9, 2007, Dep. Cagle observed a white Buick Park Avenue automobile traveling north on I-55, and informed Dep. Burgess and Lt. Swan that he had spotted a vehicle matching the Highway Patrol's description. Dep. Cagle waited for traffic to pass, then pulled out to follow the vehicle. Dep. Burgess, further north on I-55 than Cagle, pulled out directly behind the white Buick Park Avenue, ran the license, and confirmed it was the vehicle described by the Highway Patrol. The officers followed the vehicle, which signaled toward, and then pulled off at, a highway rest area. On the entrance ramp to the rest area, Deputies Burgess and Cagle turned on their emergency lights to stop the vehicle. The Buick stopped as directed.

3.     Once all three vehicles were stopped on the entrance ramp, Deputies Burgess and Cagle performed a felony stop on the white Park Avenue.[2] With gun drawn Dep. Cagle commanded the male passenger to lay down on the ground and place his hands behind his back. The subject complied, Cagle then holstered his weapon, and he placed the male in handcuffs.

4.     Next, Dep. Cagle asked the man several questions. First, the officer asked him for his name and age, to which he replied his name was "Tony Smith," and provided a birth date indicating he was 33 years old. Next, Dep. Cagle asked him whether he was armed. The man said that he was not. Dep. Cagle then asked the man if there was a weapon in the vehicle, and the subject stated that there was a gun in the trunk of the car, specifically stating that it was on the driver's side near the rear bumper.

---

[1] Given the departure time from Memphis and travel time, Lt. Swan estimated the vehicle would pass through Pemiscot County sometime between 2:30 and 2:50 a.m.

[2] The deputies thought the felony stop necessary due to the large number of people at the rest area and the high-risk nature of the alleged crime.

5. Dep. Cagle then searched the trunk of the vehicle and found a loaded .357 magnum firearm exactly where the man had described. Cagle seized and unloaded the weapon and secured it under the driver's seat of his patrol car.

6. Dep. Cagle, reading from a card, then advised the man of his <u>Miranda</u> rights. Dep. Cagle questioned him about whether he had committed the armed car-jacking, which the subject stated that he had not. Dep. Cagle then asked the subject about the gun and whether it was loaded, to which the subject responded it was loaded with five rounds. The subject also indicated that he owned the gun, that he received the gun from his sister, and that he possessed the firearm because he was protecting Ross, though she had no knowledge of the gun. Dep. Cagle also asked the subject whether he had ever been arrested before, and the man responded that he had been previously arrested for assault and battery.[3]

7. While Dep. Cagle questioned the male passenger, Dep. Burgess spoke with the woman driver of the car. She said her name was Mable Ross. He told her the police had been told that she was the alleged victim of an armed car-jacking. Ross told Dep. Burgess that the male passenger's name was "Tony Cero," that he was 30 years old, and that he was her boyfriend. Ross denied that he had forced her to drive to Chicago at gunpoint, noting that her parents disapproved of her relationship with "Tony." Ross also stated that their intended destination was a "safe-house" in Sikeston, Missouri. When asked about the handgun found in the trunk of the car, Ross responded that she had no knowledge of the weapon. Deputies Burgess and Cagle then compared the stories given to each by the male passenger and Ross, and found discrepancies between the stories.[4]

8. After questioning Ross, Dep. Burgess confronted the male passenger with the differences in their stories, specifically their names and ages. The male subject repeated that his name was "Tony," and said that Ross and

---

[3] At no time during the stop and subsequent questioning was the male suspect subjected to any duress, coercion, or punishment regarding any answers he provided. The officers did not have their guns drawn during the questioning. The male subject was coherent and answered all of the officers' questions voluntarily and responsively.

[4] Given the nature of the crime alleged, Deputies Burgess and Cagle stated they were skeptical of Ross's story, fearing that, if the male subject had indeed car-jacked her at gunpoint, he may have influenced her responses to the questions.

he were headed toward a "safe-house" in Chicago, and that he was a friend of the Chicago Police Chief, who directed them to the Chicago "safe-house." Dep. Burgess also called into dispatch for a background check. The background check revealed that the man was Timothy Duane Rankins. Rankins was found to have used numerous aliases, including 18 names, at least 5 social security numbers, and 5 dates of birth. It was also revealed that Rankins had an outstanding arrest warrant for a parole violation in California, and that he had numerous prior felonies on his record.

    9. After discovering that Rankins had an outstanding arrest warrant, Dep. Cagle arrested Rankins and placed him into the patrol car for transfer to the Pemiscot County Justice Center (PCJC). Dep. Burgess, Lt. Swan, Ross, and the children also then traveled to the PCJC in the other vehicle.

    10. Later on March 9, at the PCJC, Deputies Burgess and Cagle presented Mabel Ross with a consent to search form which would give them her consent to search her 1998 white Buick Park Avenue. Ross signed the consent form at 5:06 a.m. (Gov. Ex. 1). Deputies Burgess and Cagle then searched Ross's vehicle, but seized no additional evidence.

    11. Upon his arrival at the PCJC, Rankins asked Dep. Cagle if he was being charged in state or federal court, and stated his willingness to plead guilty to a state charge and accept the punishment the next day if the officers would allow it. While at the PCJC, Rankins was again read his Miranda rights and presented with a waiver form. Rankins refused to sign the waiver form on March 9, 2007, at 8:40 p.m. (Gov. Ex. 2).

## DISCUSSION

### A. Fourth Amendment Issues

**Investigative Terry Stop**

    The Fourth Amendment to the Constitution protects an individual from unreasonable searches and seizures. U.S. Const. amend. IV. An officer's investigative stop of a vehicle constitutes a seizure under the Fourth Amendment. See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Walker, 494 F.3d 688, 691 (8th Cir. 2007), petition for cert. filed (Nov. 21, 2007) (No. 07-7862). Any investigative stop must be supported by a reasonable articulable suspicion that criminal activity is afoot. Walker, 494 F.3d at 691 (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). Reasonable articulable suspicion requires that the officer be aware of "particularized, objective facts, which, taken together with rational inferences from those

- 4 -

facts, reasonably warrant suspicion that a crime is being committed." Id. The totality of the circumstances determines whether the particular facts known to the officer amount to an objective and particularized basis for reasonable suspicion. Id. A reasonable suspicion must be more than some hunch; a reasonable suspicion requires that the police articulate some minimal, objective justification for the investigative stop. Id.

An anonymous tip can provide the reasonable suspicion necessary to justify an investigative stop. United States v. Hernandez, 477 F.3d 210, 214 (5th Cir. 2007). In deciding the reasonableness of an anonymous tip, the court considers: (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip; (3) the ability of the officers in the field to verify the information in the field; and (4) whether the tip deals with active or recent activity. Id.

In this case, the officers' investigative stop was justified by reasonable articulable suspicion. The officers received a report of a carjacking. The information in the report included several specific facts, all of which were verified within an hour's time by the officers. The report correctly identified the make and model of the automobile, the state and number of the automobile's license plate, the direction of the vehicle, and the occupants within the vehicle. Given the seriousness of the alleged crime, along with the report's specific facts, verified by the officers, the officers were acting on more than a hunch when they stopped the vehicle. See Walker, 494 F.3d at 691. At the time of the stop, the officers had a reasonable articulable suspicion that criminal activity was afoot. See id. The investigative stop did not violate Rankin's Fourth Amendment rights.

**Statements during the Investigative Stop**

During an investigative stop, officers may take such additional steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006), cert. denied, 127 S. Ct. 1502 (2007); United States v. Doffin, 791 F.2d 118, 120 (8th Cir. 1986). At the same time, the officers' conduct must be no more intrusive than necessary to achieve the purpose of the stop. Doffin, 791 F.2d at 120. If the officers' conduct is more intrusive than necessary for the limited purpose of the investigatory stop, the officers' action may rise to a formal arrest. Id. "An investigative detention may turn into an arrest if it lasts for an

unreasonably long time or if officers use unreasonable force." Martinez, 462 F.3d at 907.

Depending on the circumstances, blocking the suspect's vehicle, approaching with guns drawn, asking a few questions, and searching for weapons may be justified by the nature of an investigative stop. Doffin, 791 F.2d at 120. Indeed, limited questioning, relating to the suspect's identity and the officers' suspicions, is consistent with an investigative stop. Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984). Given the nature of an investigative traffic stop, these questions need not be preceded by the Miranda warnings. Id. at 440. Even the "use of handcuffs does not exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution." United States v. Brown, No. 07-211-01-CR-SOW, 2007 WL 4244984, at *6 (W.D. Mo. Nov. 29, 2007); see also Martinez, 462 F.3d at 907 (noting that the use of handcuffs can be a reasonable precaution during a Terry stop).

In this case, Dep. Cagle, with gun drawn, ordered Rankins out of the car. After Rankins complied, Cagle holstered his weapon, and placed Rankins in handcuffs. Looking to Doffin and Brown, and considering the deputy was investigating a suspected car-jacking, these actions were consistent with an investigative stop. See Brown, 2007 WL 4244984 at *6 ("Given that the officers knew there was a weapon in the vehicle, the officers had a credible concern for officer safety. The officers' actions in bringing each person out of the vehicle and handcuffing them were reasonably necessary to protect the officers' personal safety and to maintain the status quo . . . ."). Looking to Berkemer, Dep. Cagle was permitted to ask Rankins his name and age, as well as information relating to the suspected car-jacking, without any preceding Miranda warnings. Berkemer, 468 U.S. at 439-40. Under the circumstances, Dep. Cagle's questions did not violate Rankin's Fourth Amendment rights.

**Seizure of the Gun**

Under the automobile exception, police officers may search a vehicle, without first obtaining a warrant, if they have probable cause to believe the vehicle contains contraband. Chambers v. Maroney, 399 U.S. 42, 48 (1970). In this case, Rankins told the officer there was a gun in the trunk, providing probable cause for the officer to search the trunk. See

id.  The search of the trunk and subsequent seizure of the weapon did not violate Rankin's Fourth Amendment rights.

## B.  Fifth Amendment Issues

**Pre-Miranda Statements**

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself in a criminal case.  U.S. Const. amend. V.  To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned before being interrogated that he has the right to remain silent and that any statement he makes may be used against him.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The safeguards described in Miranda only apply when a suspect is in custody.  Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam).

Very few motorists would feel free to disobey an officer's command to pull over or to leave the scene without first being given permission.  Berkemer, 468 U.S. at 436.  Nonetheless, persons temporarily detained during an ordinary traffic stop are not in custody for Miranda purposes – due to the temporary and public nature of a traffic stop.  Id. at 439-40.  A suspect is in custody for Miranda purposes only when he has been arrested or when his "freedom of action is curtailed to a degree associated with formal arrest."  Id.

The Eighth Circuit has developed a series of factors for determining when an individual is in custody.  United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).  These factors include: (1) whether the officer informed the suspect that the questioning was voluntary and the suspect was free to leave; (2) whether the suspect's freedom of movement was restrained during the questioning; (3) whether the suspect contacted the authorities or voluntarily agreed to answer the questions; (4) whether the officers employed strong-arm tactics or deceptive tactics during the questioning; (5) whether the atmosphere of the questioning was police-dominated; or (6) whether the officers placed the suspect under arrest at the end of the questioning.  Id.  In all cases, the relevant inquiry is how a reasonable person in the suspect's position would have understood the situation.  Berkemer, 468 U.S. at 442.

In this case, Rankins was not in custody.  Dep. Cagle asked Rankins a limited number of questions and never indicated the detention would be anything but temporary.  Dep. Cagle was the only officer who questioned

Rankins, and during the questioning, his gun was holstered.  During the brief questioning, Dep. Cagle did not employ any strong-arm tactics or subject Rankins to any duress, coercion, or threat of punishment.  There is no indication the questioning was police-dominated or that Rankins's responses were involuntary.  As noted above, an officer may handcuff a suspect as part of investigative stop, without turning the stop into a formal arrest.  Taken as a whole, these factors indicate Rankins was not in custody at the time of questioning.  Accordingly, the Miranda safeguards did not apply when Rankins responded to the officer's initial set of questions.  See Mathiason, 429 U.S. at 495.  Rankins's responses to these initial questions may be used against him without violating his Fifth Amendment rights.

**Post-Miranda Statements**

Statements made after a knowing and voluntary waiver of Miranda rights are admissible unless there were earlier, unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will. United States v. Briones, 390 F.3d 610, 614 (8th Cir. 2004).

In this case, Rankins responded to Dep. Cagle's questions after being read his Miranda rights.  These responses constituted a waiver of his rights.  See North Carolina v. Butler, 441 U.S. 369, 372-76 (1979).  At the time of the waiver, Rankins was not the subject of any duress, coercion, or threat of punishment.  His statements were made voluntarily and responsively, and were not induced by any improper government action.  See United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc).  Accordingly, Rankins's statements to the officer after he was read his Miranda rights may be used against him without violating his Fifth Amendment rights.

Whereupon,

**IT IS HEREBY ORDERED** that the motions of defendant for permission to buy and cook his own food (Docs. 13 and 22) are denied as moot.

**IT IS HEREBY RECOMMENDED** that the motion of defendant to suppress evidence and statements (Doc. 21) be denied.

The parties are advised they have ten days to file written objections to this Order and Recommendation.  The failure to file objections may result in a waiver of the right to appeal issues of fact.

**NOTICE TO SET CASE FOR TRIAL**

The above Order and Recommendation having been issued by the undersigned United States Magistrate Judge,

**IT IS HEREBY ORDERED** that, pursuant to the Administrative Order of this Court, the case be set for trial.

　　　　　　　　　　　　　　　　　　/S/　　David D. Noce　　　　
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on February 7, 2008.